THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| SENECA RABY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   CIVIL ACTION 15-0159-WS-C |
| | ) |
| TOMMIE REESE, *et al.*, | ) |
| | ) |
| Defendants. | ) |

ORDER

This matter comes before the Court on defendants' Motion for Summary Judgment (doc. 34). The Motion has been briefed and is now ripe for disposition.

I.      Nature of the Case.

Plaintiff, Seneca Raby, initiated this action by filing a *pro se* Prisoner Complaint Under 42 U.S.C. § 1983 (doc. 1) against a host of defendants relating to an incident in which he was twice bitten by a police dog of the City of Demopolis Police Department. After filing his *pro se* Complaint, Raby retained counsel, who prepared an Amended Complaint (doc. 29) that is now the operative pleading in this lawsuit. The Amended Complaint names as defendants Tommie Reese, in his official capacity as Chief of Police of the City of Demopolis, Alabama; Demopolis Police Officer Chase Courtney; Demopolis Police Officer Dion Pritchett, Jr.; and the City of Demopolis, Alabama.[1]

---

[1] The Amended Complaint also purports to name as defendants "Fictitious Defendants A through D." The pleading describes these fictitious defendants only in general terms as "officers on duty for the City of Demopolis Police Department at the time of the incident." (Doc. 29, ¶ 11.) However, fictitious-party pleading is generally not permitted in federal court, absent certain circumstances that are not present here. *See, e.g., Richardson v. Johnson*, 598 F.3d 734, 738 (11th Cir. 2010) ("As a general matter, fictitious-party pleading is not permitted in federal court."); *John Hancock Life Insurance Company (USA) v. Andrews*, 2015 WL 8346965, *1 n.1 (N.D. Ga. Dec. 8, 2015) ("Fictitious party pleading is not permitted in federal court, unless Plaintiff describes the defendants with enough specificity to determine their identities."); *Dubose v. City of Hueytown*, 2015 WL 5011383, *4 (N.D. Ala. Aug. 24, 2015) (Continued)

The Amended Complaint alleges that the defendant officers used excessive force against Raby on January 30, 2014, causing him to sustain "permanent physical and psychological trauma." (Doc. 29, ¶ 2.)  His pleading asserts the following causes of action: (i) Count I, a § 1983 claim for excessive force alleging that defendants used unnecessary and excessive force in causing or allowing the K-9 to attack Raby, and that the City "is liable for the actions of its employees" (*id.*, ¶ 21); (ii) Count II, a § 1983 failure to train / supervise claim against the City and Chief Reese for failing "to adequately train and supervise Defendant Officers in the areas of use of excessive force, use of canine units, and arrest procedures" (*id.*, ¶ 28); (iii) Count III, a state-law claim for intentional infliction of emotional distress, based on defendants having "used a canine to scare, control, and intimidate Raby" (*id.*, ¶ 37); (iv) Count IV, a state-law claim for assault and battery, predicated on defendant Officer Courtney's "harmful and highly offensive" touching of Raby (*id.*, ¶ 43), with vicarious liability for the City; (v) Count V, a state-law claim for wantonness; and (vi) Count VI, a state-law claim for outrage positing that "Defendants knew or should have known that Raby was likely to suffer mental distress and could have become severely physically hurt by using a canine unit to attack Raby" (*id.*, ¶ 53).

The style of the Amended Complaint reflects that Chief Reese is sued "in his official capacity" (doc. 29, at 1); however, the pleading lacks any designation as to whether Officers Courtney and Pritchett are sued in their individual capacities, their official capacities, or both.  In his summary judgment brief, however, Raby repeatedly, unambiguously clarifies that the individual defendants are sued exclusively in their official capacities.[2]  Plaintiff is bound by his attorney's clear disclaimers on this point, and this Order proceeds in recognition of his express

---

("Fictitious party practice is generally not permitted in federal court."); *see generally* Rule 10(a), Fed.R.Civ.P. ("The title of the complaint must name all the parties …."). In accordance with this general rule, and the inapplicability of the narrow exceptions to same, Raby's claims against Fictitious Defendants A through D are **dismissed**.

[2]   *See* doc. 41, at 25 ("Raby has sued the city of Demopolis in addition to the individual defendants in their official capacities, rather than in their personal capacities"), 30 ("Raby has brought this lawsuit against the Defendants in their official, not personal capacities. The Defendants' state-agent immunity argument is irrelevant because it would only apply if Raby brought this suit against the officers in their <u>personal</u> capacities.").

representations in court filings that the individual defendants are not sued in their individual capacities, but only in their official capacities.

## II. Background Facts.[3]

### A. Raby's Apprehension and Arrest.

It had snowed in Demopolis, Alabama, so Seneca Raby took the day off from work on January 30, 2014 and played dominoes. (Raby Dep. (doc. 35-1), at 23.) That evening, Raby went to a local restaurant/lounge called the Red Barn to shoot pool and drink beer. (*Id.* at 23, 25.) At some point, things turned ugly when Raby became embroiled in a verbal altercation with an unknown female patron about a long-forgotten topic. (*Id.* at 26-27.) When Raby eventually left the establishment, he was accosted by three individuals who "jumped out of the truck." (*Id.* at 27-28.) So Raby drew his firearm that he kept in his vehicle's center console and discharged it in the air at least three times. (*Id.* at 28-29.) His stated objective was "just to let them know to leave me alone." (*Id.* at 29.) The strategy succeeded, but yielded unanticipated consequences. When he stopped shooting, Raby heard approaching sirens, causing him to surmise (correctly) that the police were en route. (*Id.* at 30.) In response, Raby fled on foot to a nearby shopping area and lay down in a "little brush" behind an AT&T store. (*Id.* at 30-31.) Sometime before the police arrived, Raby threw the gun because, being a convicted felon and therefore a prohibited person under federal law, he "didn't want to get caught with it." (*Id.* at 33.)

For their part, Officers Pritchett and Courtney had been part of a group of Demopolis police officers congregated at a Chevron station a "couple hundred yards" from the Red Barn when their role in the evening's events began. (Pritchett Dep. (doc. 35-2), at 11-12; Courtney

---

[3] The Court is mindful of its obligation under Rule 56 to construe the record, including all evidence and factual inferences, in the light most favorable to the nonmoving party. *See Skop v. City of Atlanta, GA*, 485 F.3d 1130, 1136 (11th Cir. 2007). Thus, plaintiff's evidence is taken as true and all justifiable inferences are drawn in his favor. Also, federal courts cannot weigh credibility at the summary judgment stage. *See Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1252 (11th Cir. 2013) ("Even if a district court believes that the evidence presented by one side is of doubtful veracity, it is not proper to grant summary judgment on the basis of credibility choices."). Therefore, the Court will "make no credibility determinations or choose between conflicting testimony, but instead accept[s] [Raby's] version of the facts drawing all justifiable inferences in [his] favor." *Burnette v. Taylor*, 533 F.3d 1325, 1330 (11th Cir. 2008).

Dep. (doc. 35-3), at 43.)[4] Each officer had his own patrol car at that location; moreover, Officer Courtney was a certified K-9 officer whose dog, a German shepherd named Bo, was in his vehicle with him. (Raby Dep., at 52; Pritchett Dep., at 12; Courtney Dep., at 44; Clarke Dep. (doc. 35-5), at 42.) As the officers talked at the Chevron, they heard what sounded like gunshots. Moments later, dispatch called to alert them that a suspect was shooting at the Red Barn. (Pritchett Dep., at 13.) Multiple officers immediately drove to the scene. Upon their arrival, a witness approached Officer Courtney's vehicle and said that "a man had been shooting" and that the witness, who was observed to be hobbling, "thought he had been shot in the foot." (Courtney Dep., at 43.) Additionally, a woman ran to Officer Pritchett's vehicle, indicated that "Seneca Raby was shooting," and advised that Raby "took off running toward the wood line." (Pritchett Dep., at 13.) Although Officer Pritchett did not know Raby by name, he realized that he knew Raby from the description given by the female witness (*i.e.*, that Raby "wore those loopy earrings, and he had a baby by another female"). (*Id.* at 14-15.)

Based on these witness reports, at least three officers, including Officers Courtney and Pritchett, set up a perimeter near the wood line. Officer Pritchett angled his car towards the woods, "turned [his] lights on bright and turned [his] take-downs on," and activated his "bright LED flashlight" in that direction. (Pritchett Dep., at 15, 18.) According to Officer Pritchett, he was "flashing [his] flashlights throughout the wood line" and "light[ing] up the trees" because "LED is pretty bright." (*Id.* at 20.) Had there been a person standing or kneeling there, Officer Pritchett "would have been able to see the person with [his] flashlight on." (*Id.* at 21, 22-23.) Meanwhile, Officer Courtney pulled his car to a stop near the wood line, with high beams, spotlight and blue lights all activated. (Courtney Dep., at 58.) His lights were all shining towards the woods "to illuminate whatever was in there." (*Id.* at 60.)

---

[4] In his summary judgment brief, plaintiff objects to defendants referencing defendant Courtney as "Officer Courtney," on the grounds that this defendant is no longer employed as a police officer. (Doc. 41, at 1 n.2.) The objection is frivolous. At all material times, defendant Courtney was a patrol officer with the City of Demopolis Police Department, acting in his capacity as a patrol officer with the City of Demopolis Police Department. Raby is suing him solely in that capacity. It is, therefore, both accurate and appropriate to refer to him as "Officer Courtney" in the context of summary judgment briefing providing a narrative of events on the night in question.

As fate would have it, Officer Courtney parked on the side of the AT&T store building, "pretty close" to Raby's hiding place. (Raby Dep., at 34.) Upon parking, Officer Courtney exited the vehicle and retrieved Bo (the German shepherd) from the back seat. (Courtney Dep., at 58.) Raby saw him do this. (Raby Dep., at 34.) At around this time, Officer Courtney yelled for Raby to come out. (Courtney Dep., at 59; Raby Dep., at 36.) In response, Raby got onto his knees and put his hands up in the air. (Raby Dep., at 34, 36, 38.) Raby knows that Officer Courtney could see him at that time because Raby "wasn't far" from Officer Courtney's position and his headlights were shining on Raby. (*Id.* at 35-36, 38.)[5] Thus, Raby had complied with Officer Courtney's directive, and Officer Courtney knew it. (*Id.* at 38.)

Even though Raby had gone to his knees and put his hands in the air, Officer Courtney turned Bo loose. (Raby Dep., at 39.) The dog ran to Raby and jumped on him, causing Raby to "ball up" to attempt to prevent Bo from biting his face. (*Id.*) Officer Pritchett observed Bo "grabbing" and "tugging" on Raby's shoulder. (Pritchett Dep., at 31.) Bo remained on Raby for "a good little second, good little time." (Raby Dep., at 41.) Bo did not make a sound to alert the officers because "[h]is mouth was full at the time." (Courtney Dep., at 70.) Officer Courtney saw that "[t]he dog had him here on the shoulder," so Officer Courtney "put [his] lead on the dog

---

[5] The Court recognizes, of course, that defendants vigorously dispute Raby's assertions on these points. In defendants' view, Raby is lying when he says he was on his knees in an open area with his hands up. (Courtney Dep., at 96.) Indeed, Officer Courtney testified that "[i]t was entirely too dark" to see what was happening in the woods. (*Id.* at 71.) Defendants also balk that Raby's descriptions of those events "cannot be used to dispute what the officers perceived." (Doc. 42, at 2.) Defendants are incorrect. At a minimum, Raby's testimony (*i.e.*, that Officer Courtney's headlights were shining on him, that he came to his knees and put his hands up not far from where Officer Courtney was, and that there were no impediments to Officer Courtney's ability to see him) creates a dispute of fact because this evidence contradicts Officer Courtney's testimony about his own perceptions. Besides, defendants' argument overlooks defendant's testimony that Officer Pritchett had located Raby, could see him clearly, and was shining his flashlight on Raby before Officer Courtney (who was standing just 5 to 10 feet away from Officer Pritchett) released Bo. (Pritchett Dep., at 27-28 ("I still had my light on the subject just lying down. He then gave verbal commands again. I'm fixing to send my K-9. You need to come out.").) Thus, defendants' own evidence reflects that Raby was visible to the officers before they released the K-9 unit. In light of the foregoing, and Rule 56's directive that evidence must be taken in the light most favorable to the nonmovant, the Court credits Raby's testimony for summary judgment purposes, as set forth above.

and gave the command to let go, and the dog backed off." (*Id.* at 72-73.)[6] Raby was then handcuffed and taken into custody. (*Id.* at 73-74; Raby Dep., at 42.) At this time, the officers felt that they "had the situation under control," as Raby was neither resisting nor otherwise noncompliant. (Clarke Dep., at 41-43.) From the time Raby was handcuffed, he "just stood there and complied with every one of their orders." (Raby Dep., at 69-70.)

Upon arresting Raby, the officers asked him where the gun was. Raby responded, untruthfully, that he did not know because he "didn't want to get caught with the gun." (Raby Dep., at 42.) Raby also complained to the officers that "this dog already ate me up one time for no reason." (*Id.* at 54.) Officer Pritchett's reply was, "well, if you don't tell us where that gun at [sic], we're going to put him on you again." (*Id.*) When Raby refused to disclose the location of his firearm, the officers put Bo on him a second time, but then were unable to get Bo to release. (*Id.*)[7] Ultimately, Officer Pritchett tased Bo to force him to let go of Raby. (*Id.* at 62.) Officer Courtney was close enough to Bo to grab his collar and pull the dog off. (Clarke Dep., at 66.) Raby incurred fresh trauma in this second entanglement with Bo, including injuries to his left arm and wrist, the latter of which occurred when the handcuffs dug into Raby's wrist as the dog pulled his arm. (Raby Dep., at 55.) The officers subsequently took Raby to the hospital. (*Id.* at 56.) Raby saw doctors on two occasions for medical treatment, which consisted of "some shots." (*Id.* at 70-71.) Raby had no broken bones, and received no stitches. (*Id.*)[8]

---

[6] According to Raby, this first attack caused injuries to Raby's back and left ear. (Raby Dep. at 55.) Raby was also bitten in the back of the head. (*Id.* at 55-56.)

[7] Once again, defendants' version of the narrative diverges from Raby's. Officer Pritchett's testimony is that, after the suspect was in handcuffs, Officer Pritchett advised Raby not to make any "false movements like jerking away from officers" because they might cause the K-9 to reengage. (Pritchett Dep., at 36-37, 43.) Despite this warning, Raby suddenly "jerked away" from Officer Pritchett, at which time Bo "got a hold to his jacket." (*Id.* at 37, 41-42.) Officer Pritchett denies ever threatening to turn the dog loose on Raby again unless he divulged the whereabouts of the firearm. (*Id.* at 37-38.) Officer Clarke's testimony was consistent with Officer Pritchett's. (Clarke Dep., at 62-65, 79.) Nonetheless, for summary judgment purposes, Raby's account is credited and defendants' is not.

[8] Bo sustained minor injuries in his encounters with Raby, as Officer Courtney observed that the dog's "entire eye had filled with blood" following the scuffle in the woods. (Courtney Dep., at 75.) However, Bo suffered no adverse long-term effects. A veterinary report from February 25, 2014 cleared Bo to return to work and perform normal officer duties, as his eye had healed from the laceration and his light response was intact. (Doc. 35-7, at 2.)

### B.     The City's K-9 Training Policies, Procedures and Experiences.

Defendant Tommie Reese has served as Chief of the City of Demopolis Police Department since 2009.  (Reese Dep. (doc. 35-6), at 4.)  During that time, a total of three K-9 officers, including Officer Courtney, have worked for the Demopolis Police Department.  (*Id.* at 11.)  According to Chief Reese, the dual purposes of the City's K-9 unit include a primary function of narcotics searches, along with the ability to perform apprehension as needed.  (*Id.* at 11, 15-16.)  Both Officer Courtney and Bo were certified for narcotics and apprehension functions.  (Courtney Dep., at 33.)

Before the incident in question, the City sent Bo to be trained at the Alabama K-9 Training Center in Tuscaloosa.  (Reese Dep., at 12.)  Similarly, Officer Courtney attended and completed a 320-hour training program with Alabama K-9 in Samantha, Alabama beginning in October 2013.  (Courtney Dep., at 18-19.)  To supplement this initial training, Chief Reese required Officer Courtney and Bo to train together on a monthly basis, which they did.  (Reese Dep., at 21, 23-24, 35.)  Most of their training exercises involved the narcotics search function because the City does not "deal with a lot of apprehension here."  (Reese Dep., at 17-18.)  Nonetheless, Officer Courtney and Bo also "did a lot of tracking" and incorporated "apprehension techniques" into their training exercises.  (Courtney Dep., at 34.)  Pursuant to these training activities, when Officer Courtney gave the command to apprehend, Bo would go to and bite the suspect unless Officer Courtney gave the stop command, which he would do if, for example, the suspect had his hands up and was not resisting.  (*Id.* at 29-31.)

The City has a written "Canine Section Policy."  (Doc. 35, Exh. 8.)  Among other things, the Policy requires a K-9 handler to "demonstrate the ability to control the canine during an obedience performance test.  Testing will be conducted using reasonable job related distractions."  (*Id.* at 3.)  The Policy further provides that "[u]nder the direction and reasonable control of the handler, the canine will locate a hidden person in a structure or building and in an outdoor area within a reasonable period of time.  The dog will 'alert' the handler after finding the person."  (*Id.* at 3-4.)  On the subject of controlling the animal, the Policy states that "[t]he Handler of the Police Canine must be able to control the canine at all times when he is not confined in a vehicle or in a kennel.  This can be done on or off-leash.  If the canine is off-leash the handler must be in direct contact with the canine and be in a close enough proximity to gain physical control of the canine immediately if a situation presents itself."  (*Id.* at 7.)

Officer Courtney testified that he kept Bo five feet away from the suspect once Raby was in custody because "that's just walking distance," which he perceived as "a safe distance from Mr. Raby." (Courtney Dep., at 87.) He acknowledged that the City had "no standard operating procedure on how to walk your dog," and that Bo's job was over as soon as he apprehended Raby in the woods. (*Id.* at 87-88.) Officer Courtney further conceded that the City's Canine Section Policy lacked specific guidelines on the topic of apprehension, and that no other City policy or training guide would have addressed such matters directly. (*Id.* at 95, 98-99.) Chief Reese explained that the City had no specific apprehension policy because apprehension is a use of force, and the City's policies concerning the use of force continuum apply to police K-9 officers (including dogs and handlers) just as they would to any other officer. (Reese Dep., at 26-28.) Chief Reese further testified that he saw no need for a policy addressing post-arrest handling of a K-9 unit, and that it was a matter reserved for the officer's discretion whether to keep the dog out following Raby's arrest, return him to Officer Courtney's patrol vehicle, or take some other action. (*Id.* at 37, 41.)

Other than the Raby incident that forms the basis of this litigation, Chief Reese was aware of no problems with the City's K-9 units and received no complaints concerning Officer Courtney's handling of Bo at any time. (Reese Dep., at 12-13.)[9]

**III.   Summary Judgment Standard.**

Summary judgment should be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a), Fed.R.Civ.P. The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991). Once the moving party has satisfied its responsibility, the burden shifts to the non-movant to show the existence of a genuine issue of material fact. *Id.* "If the nonmoving party fails to make

---

[9] That said, the record does reveal one other incident involving Bo. In March 2014, approximately two months <u>after</u> the incident forming the basis of Raby's claims, there was an occasion in which Bo was in Officer Courtney's yard when someone walked across the yard carrying a stick. As Bo approached, the person swung the stick, prompting Bo to bite the person. (Reese Dep., at 13-14.) Bo remains in service as a K-9 unit at the City of Demopolis at this time. (*Id.* at 14.)

'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment." *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted). "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 999 (11th Cir. 1992) (internal citations and quotations omitted). "Summary judgment is justified only for those cases devoid of any need for factual determinations." *Offshore Aviation v. Transcon Lines, Inc.*, 831 F.2d 1013, 1016 (11th Cir. 1987) (citation omitted).

### IV.  Analysis.

#### A.  *Section 1983 Claims.*

As discussed, *supra*, the only named defendants in this action are the City of Demopolis, Chief Reese, Officer Courtney and Officer Pritchett, with all officers being named exclusively in their official capacities.[10]

"Official-capacity suits … generally represent only another way of pleading an action against an entity of which an officer is an agent." *Penley v. Eslinger*, 605 F.3d 843, 854 (11th Cir. 2010) (citation omitted); *see also Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1309 (11th Cir. 2009) ("A claim asserted against an individual in his or her official capacity is, in reality, a suit against the entity that employs the individual.") (citation omitted); *Cook ex rel. Estate of Tessler*

---

[10] The parties' summary judgment briefs address the defense of qualified immunity. Where individual defendants are sued only in their official capacities, however, the individual-capacity defense of qualified immunity is inapplicable. *See, e.g., Young Apartments, Inc. v. Town of Jupiter, FL*, 529 F.3d 1027, 1047 (11th Cir. 2008) ("[I]t is well-settled that qualified immunity only protects public officials from lawsuits brought against them in their individual capacity.") (citation omitted); *Bruce v. Beary*, 498 F.3d 1232, 1249 n.33 (11th Cir. 2007) ("Sheriff Beary, sued in his official capacity, is not, of course, entitled to, nor has he asserted, the individual capacity defense of qualified immunity."); *Marsh v. Butler County, Ala.*, 268 F.3d 1014, 1023 n.4 (11th Cir. 2001) ("[T]he defense of qualified immunity … is valid only against claims asserted against a government official in her individual capacity."); *Lloyd v. Van Tassell*, 318 Fed.Appx. 755, 760 (11th Cir. Jan. 27, 2009) ("the qualified immunity defense does not apply to an official sued in his official capacity"); *Brienza v. Gee*, 307 Fed.Appx. 352, 353 (11th Cir. Jan. 13, 2009) ("Qualified immunity is not available to Sheriff Gee in his official capacity, and he does not argue that it is.").

*v. Sheriff of Monroe County, Fla.*, 402 F.3d 1092, 1115 (11th Cir. 2005) ("[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. It is not a suit against the official personally, for the real party in interest is the entity.") (citation omitted); *Brown v. Neumann*, 188 F.3d 1289, 1290 (11th Cir. 1999) ("We start with the proposition that a suit against a governmental official in his official capacity is deemed a suit against the entity that he represents."); *Busby v. City of Orlando*, 931 F.2d 764, 776 (11th Cir. 1991) ("Because suits against a municipal officer sued in his official capacity and direct suits against municipalities are functionally equivalent, there no longer exists a need to bring official-capacity actions against local government officials …."). As a practical matter, then, Raby's § 1983 claims against the City, Chief Reese and the officers in their official capacities functionally reduce to § 1983 claims against the City itself. The relevant question thus becomes when and under what circumstances a municipality can be held liable under § 1983 for its employees' misconduct.

It is well-settled, of course, that a municipality "cannot be held vicariously liable under § 1983 for constitutional violations committed by its officers." *Hoefling v. City of Miami*, 811 F.3d 1271, 1279 (11th Cir. 2016); *see also Hill v. Cundiff*, 797 F.3d 948, 977 (11th Cir. 2015) (explaining that a municipality "may not be held liable for constitutional deprivations on the theory of *respondeat superior*"). Rather, a plaintiff must establish that "the City had a policy, custom, or practice that caused the deprivation," such as "an official policy enacted by its legislative body" or "if final policymakers have acquiesced in a longstanding practice that constitutes the entity's standard operating procedure." *Hoefling*, 811 F.3d at 1279; *see also Hill*, 797 F.3d at 977 ("A municipality therefore may be held liable only if such constitutional torts result from an official government policy, the actions of an official fairly deemed to represent government policy, or a custom or practice so pervasive and well-settled that it assumes the force of law") (citation omitted).

Plaintiff's filings make clear that his claims against the City are rooted in a theory of failure to train or supervise. (*See* doc. 41, at 26-27.) "A failure to adequately train municipal employees constitutes an actionable policy or custom for § 1983 purposes only where the failure to train amounts to deliberate indifference to the rights of persons with whom the [employees] come into contact." *Cook*, 402 F.3d at 1116 (citations and internal quotation marks omitted); *see also American Federation of Labor and Congress of Indus. Organizations v. City of Miami, FL*, 637 F.3d 1178, 1188 (11th Cir. 2011) ("inadequacy of police training may serve as the basis for §

1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact"). "Failure to train can amount to deliberate indifference when the need for more or different training is obvious, … and when the failure to train is likely to result in the violation of a constitutional right." *Belcher v. City of Foley, Ala.*, 30 F.3d 1390, 1397-98 (11th Cir. 1994); *see generally Hill*, 797 F.3d at 977 (for municipal action to constitute deliberate indifference, "[t]he evidence must show the deprivation of the constitutional right is a 'plainly obvious consequence' of the municipal action"). To meet this stringent standard, "a plaintiff must present some evidence that the municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action." *Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998) (citations omitted).[11] Plaintiffs typically show deliberate indifference in this context by presenting evidence of a history of widespread prior abuse that would place the municipality on notice of the need for improved training or supervision. Here, however, Raby concedes that he has no evidence of "a pattern of constitutional violations of which the Defendants had notice." (Doc. 41, at 27 n.10.)

To meet the daunting "deliberate indifference" threshold on his failure to train / supervise theories, Raby argues that the City's "Canine Section Policy" and "canine officer training program" were deficient because the Policy "does not mention apprehension, seizure, or arrest" and "had no policy concerning the procedures for handling a canine after a suspect is arrested and handcuffed." (Doc. 41, at 27.) In plaintiff's view, then, the requisite deliberate indifference is established by the City's failure to develop and implement policies as to "(1) the proper use of a canine unit to apprehend a suspect; and (2) what the canine officer must do with the dog after a suspect is safely placed in custody and no longer poses a danger to the officers." (*Id.*)

By all appearances, Raby is traveling under the so-called "so obvious" method of proving deliberate indifference. In the absence of a pattern of constitutional violations, federal courts

---

[11] More generally, "[t]he Supreme Court has noted the 'deliberate indifference' standard under § 1983 is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Hill*, 797 F.3d at 977 (citation and internal quotation marks omitted); *see also McDowell v. Brown*, 392 F.3d 1283, 1291 (11th Cir. 2004) ("To meet this burden, a plaintiff must demonstrate that the lawful action was taken with deliberate indifference as to its known or obvious consequences.") (citations and internal quotation marks omitted).

have recognized that § 1983 municipal liability may attach when "the need to train and supervise in the particular areas in issue was so obvious and the likelihood of constitutional violations was highly predictable so that liability attaches for this single incident." *Gold*, 151 F.3d at 1352; *see also Lewis v. City of West Palm Beach, Fla.*, 561 F.3d 1288, 1293 (11th Cir. 2009) ("deliberate indifference may be proven without evidence of prior incidents, if the likelihood for constitutional violation is so high that the need for training would be obvious"); *Barr v. Gee*, 437 Fed.Appx. 865, 874 (11th Cir. Aug. 16, 2011) ("A municipality may be put on notice if either (1) the municipality is aware that a pattern of constitutional violations exists, and nevertheless fails to provide adequate training, or (2) the likelihood for a constitutional violation is so high that the need for training would be obvious."). The Eleventh Circuit has stressed that "[e]stablishing notice of a need to train or supervise is difficult," and that "it must have been obvious that the municipality's failure to train or supervise its employees would result in a constitutional violation." *American Federation of Labor*, 637 F.3d at 1189. In only a "narrow range of circumstances" can deliberate indifference be shown without a pattern of constitutional violations. *Gold*, 151 F.3d at 1352 (no obvious need for training as to arrestees' complaints about handcuff procedures); *see also Lewis*, 561 F.3d at 1293 (officers' use of hobble restraints and hogtying techniques "does not carry a high probability for constitutional violations in the manner intended by the 'so obvious' notice that would open the door to municipal liability").

Viewing the record in the light most favorable to plaintiff, the Court concludes that no reasonable finder of fact could deem it "obvious" that constitutional violations would occur unless the City developed and instituted policies as to "(1) the proper use of a canine unit to apprehend a suspect; and (2) what the canine officer must do with the dog after a suspect is safely placed in custody and no longer poses a danger," which are the alleged deficiencies at the core of Raby's § 1983 failure-to-train theory of liability. After all, the record shows that Officer Courtney completed a 320-hour training program with the Alabama K-9 Training Center shortly before the subject incident occurred; that Bo the dog also underwent training at the Alabama K-9 Training Center; that both Officer Courtney and Bo were certified in the areas of narcotics and apprehension; that the City required Officer Courtney and Bo to train together monthly; that, while the subjects of those training exercises were left to Officer Courtney's discretion, they included both narcotics and apprehension techniques (the very two functions for which the City deployed its K-9 unit); and that Officer Courtney's use of Bo in apprehensions was subject to the

City's policies concerning the use of force continuum. Given the extensive training that Officer Courtney and Bo had already received, their status as certified for apprehension work, their ongoing training (including apprehension techniques) and the intersection of apprehension functions with the City's use of force policies, it was certainly not "obvious" that constitutional violations would occur unless the City mandated further training or supervision in the specified areas. On these facts, and given the narrowness of the "so obvious" basis for § 1983 municipal liability, the Court readily determines that Raby's claims fail as a matter of law. Simply put, the risk from any possible imperfection in the training and supervision of the City's K-9 unit here is not obvious in the abstract, and therefore cannot support § 1983 liability on a failure to train / supervise theory.[12] Accordingly, defendants are entitled to summary judgment on Raby's § 1983 claims against the City and individual defendants in their official capacities.

---

[12] Again, Raby identifies two purported defects in the City's policies. First, he says, the City should have had a policy governing "the proper use of a canine unit to apprehend a suspect." (Dc. 41, at 27.) But plaintiff does not dispute that Officer Courtney and Bo had already received training on apprehension techniques and had been certified in apprehension. Nor does Raby make any showing that it was or should have been obvious to the City that such training and certifications were inadequate to prevent constitutional violations in the area of apprehensions. Moreover, plaintiff undercuts his own argument by conceding that "[t]he City's [existing] policy would not have allowed [Officer] Courtney to release the dog to attack Raby while he was kneeling, in the open, and with his hands up." (Doc. 41, at 27.) So, by plaintiff's own admission, the City's existing policy prohibited the very misdeeds alleged by Raby to have occurred here; therefore, there was no gap in the policy on this point, by plaintiff's own concession. Second, as for plaintiff's assertion that the City's policy was deficient because it failed to address "what the canine officer must do with the dog after a suspect is safely placed in custody," there are myriad permutations, scenarios and possibilities that might play out, and plaintiff has made no showing that a "one-size-fits-all" policy prescription would have been workable, or that it even would have made sense. On that basis, Chief Reese's explanation that it was a matter of officer discretion what to do with the K-9 unit after an arrest was completed appears imminently reasonable. It certainly was not obvious that constitutional violations would result unless the City adopted a more comprehensive policy governing post-arrest K-9 handling protocols. Besides, plaintiff's argument appears to be that the City needed to train K-9 officers not to use their dogs to attack, antagonize and traumatize compliant, handcuffed arrestees into answering police questions. This kind of "common sense" prohibition is not the stuff of a § 1983 failure-to-train violation for municipal liability. *See, e.g., Doe v. City of Demopolis*, 461 Fed.Appx. 915, *2 (11th Cir. Mar. 20, 2012) ("If the impropriety of an action is obvious to all without training, a failure to train a police officer to refrain from taking that action will usually not show deliberate indifference. … The City was entitled to rely on Smith's common sense not to commit statutory rape, so its alleged failure to train him not to commit statutory rape does not (Continued)

### B.     *State-law Claims.*

In addition to the § 1983 claims, Raby has asserted state-law claims against the defendants for intentional infliction of emotional distress (Count III), assault and battery (Count IV), wantonness (Count V) and outrage (Count VI).  Again, all such claims are asserted against defendants solely in their official capacities.  (Doc. 41, at 30.)  Plaintiff seeks an award of compensatory and punitive damages for each of these state-law claims.  (Doc. 29, at 8.)

The Alabama Supreme Court has recognized that, just as claims against county commissioners in their official capacities constitute claims against the county, "claims that are brought against municipal employees *in their official capacity* are also, as a matter of law, claims against the municipality."  *Morrow v. Caldwell*, 153 So.3d 764, 771 (Ala. 2014); *see also Alabama Mun. Ins. Corp. v. Allen*, 164 So.3d 568, 576 (Ala. 2014) (same); *Ex parte Labbe*, 156 So.3d 368, 374 (Ala. 2014) ("the claims asserted against Mayor Labbe in his official capacity are simply claims asserted against the City"); *Dickinson v. City of Huntsville*, 822 So.2d 411, 415 (Ala. 2001) (reasoning that a mayor is "in her official capacity, within the line and scope of her office, the agent of the City, through whom the City acts.  Thus, ***to sue the mayor in her official capacity is simply another way of suing the City***.") (emphasis added).[13]

---

show deliberate indifference to the rights of its inhabitants.") (citations and internal quotation marks omitted).

[13]     *See generally Smitherman v. Marshall County Com'n*, 746 So.2d 1001, 1007 (Ala. 1999) ("We hold, therefore, that claims against county commissioners and employees *in their official capacity* are, as a matter of law, claims against the county and are subject to the $100,000 cap contained in § 11-93-2."); *Todd v. Kelley*, 783 So.2d 31, 38 n.1 (Ala.Civ.App. 2000) ("Because we need not separately address any claims against the city officials in their official capacities, we will refer only to the City and not to the officials in their official capacities when addressing [plaintiff's] substantive claims"); *Hinson v. Holt*, 776 So.2d 804, 810 (Ala.Civ.App. 1998) ("Claims against officers in their official capacity are 'functionally equivalent' to claims against the entity they represent.") (citation and quotation marks omitted); *Tolbert v. Trammell*, 2014 WL 3892115, *11 (N.D. Ala. Aug. 4, 2014) ("Alabama law deems suits against agents of the city in their official capacities to be simply another way of suing the City") (citation and internal quotation marks omitted); *Tippins v. City of Dadeville*, 2014 WL 1092920, *5 (M.D. Ala. Mar. 19, 2014) ("In this case, the City is a defendant and, thus, under the rationale of *Dickinson*, Mayor Ingram's and Ms. Harrelson's presence in their official capacities is unnecessary and, in fact, redundant. … Accordingly, all state-law claims against Mayor Ingram and Ms. Harrelson in their official capacities are due to be dismissed.  The remaining analysis thus relates only to the state-law claims against the City.").

By statute, Alabama provides that there can be no municipal liability for personal injuries or wrongs, "unless such injury or wrong was done or suffered through the neglect, carelessness, or unskillfulness of some agent, officer, or employee of the municipality …." Ala. Code § 11-47-190.  Alabama courts have emphasized that "[t]here is no exception in the statute allowing an action against a municipality for the wanton or willful conduct of its agents or employees." *Morrow*, 153 So.3d at 769.  What this means is that, as a matter of Alabama law, "a city is liable for negligent acts of its employees within the scope of their employment, but not intentional torts [or wanton misconduct] of its employees." *Brown v. City of Huntsville, Ala.*, 608 F.3d 724, 742-43 (11th Cir. 2010).[14]

Considering these black-letter principles of Alabama law in tandem yields the following analysis in this case:  Raby's state-law claims against Chief Reese, Officer Courtney and Officer Pritchett in their official capacities are simply another way of bringing those same state-law claims against the City.  As such, the individual defendants need not be considered separately; rather, these claims are properly viewed strictly as claims against the City itself.  Moreover, because all of these state-law claims sound in theories of intentional or wanton conduct by the City's agents or employees (*i.e.*, assault, battery, intentional infliction of emotional distress, wantonness, outrage), such claims against the City are barred by operation of Alabama Code § 11-47-190.  Simply put, Alabama forbids holding municipalities liable for the intentional or wanton acts of their employees.  That is precisely what Raby seeks to do here.  Such reasoning defeats all of Claims III, IV, V and VI as a matter of law because (i) all such claims allege

---

[14] *See also Labbe*, 156 So.3d at 374 ("because the City cannot be held liable for wanton or intentional conduct, it is likewise immune from suit for those claims asserted by the plaintiffs alleging wanton and/or intentional conduct by the City"); *Walker v. City of Huntsville*, 62 So.3d 474, 501 (Ala. 2010) (observing that § 11-47-190 bars intentional tort claims against city because it "limits the liability of a municipality to injuries suffered through the neglect, carelessness, or unskillfulness of some agent") (citation and internal quotation marks omitted); *Cremeens v. City of Montgomery*, 779 So.2d 1190, 1201 (Ala. 2000) ("A municipality cannot be held liable for the intentional torts of its employees."); *Town of Loxley v. Coleman*, 720 So.2d 907, 909 (Ala. 1998) ("This Court has construed § 11-47-190 to exclude liability for wanton misconduct."); *Waters v. City of Geneva*, 47 F. Supp.3d 1324, 1340 (M.D. Ala. 2014) (dismissing state-law claims against municipality for assault, battery, intentional inflection of emotional distress, wantonness, and outrage, among others, pursuant to § 11-47-190); *Howard v. City of Demopolis, Ala.*, 984 F. Supp.2d 1245, 1262 (S.D. Ala. 2013) ("the City may be found liable for the negligent acts of its employees but not their intentional torts").

wanton or intentional conduct by the City's agents or employees, (ii) the City cannot be held liable for any of those acts or omissions under Alabama law, and (iii) Raby has restricted all of these state-law claims to defendants' official capacities.  Accordingly, summary judgment is properly entered in defendants' favor on all such causes of action.

### V.     Conclusion.

For all of the foregoing reasons, the Court concludes that there are no genuine issues of material fact and that defendants are entitled to entry of judgment in their favor as a matter of law.  As such, defendants' Motion for Summary Judgment (doc. 34) is **granted** and this action is **dismissed with prejudice**.  A separate judgment will enter.

DONE and ORDERED this 25th day of April, 2016.

s/ WILLIAM H. STEELE
CHIEF UNITED STATES DISTRICT JUDGE